**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| R. S. HANLINE AND CO., INC.<br>17 Republic Avenue<br>Shelby, Ohio 44875 | ) ) ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| vs. | ) | |
| | ) | |
| THOMAS P. DUNAWAY<br>840 S. Poplar Avenue<br>Elmhurst, Illinois 60126 | ) ) ) | **VERIFIED COMPLAINT** |
| | ) | |
| and | ) | |
| | ) | |
| OLIVIA SZCZERBA<br>2919 N. Nashville Avenue<br>Chicago, Illinois 60634 | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAN GLUZMAN<br>1100 Old Barn Rd.<br>Buffalo Grove, Illinois 60089 | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

1. Plaintiff R. S. Hanline and Co., Inc. ("Hanline") seeks a temporary restraining order and preliminary and permanent injunctive relief, as well as compensatory and punitive damages, against its former employees Defendants Thomas P. Dunaway ("Dunaway"), Olivia Szczerba ("Szczerba"), and Daniel Gluzman ("Gluzman") (Dunaway, Szczerba, and Gluzman are collectively referred to herein as "Defendants") based on Defendants' breach of their contractual obligations owed to Plaintiff and misappropriation of Plaintiff's confidential and trade secret information, all as more fully set forth below.

## **NATURE OF THIS ACTION**

2.      Hanline is a corporation organized and existing under the laws of Ohio that does business in the state of Ohio and has a principal place of business in Richland County.  Hanline's main office is located in Shelby, Ohio.

3.      Dunaway is the former Sales Manager of Hanline's office in Chicago, Illinois. Dunaway is currently employed by Premier Produce Services, LLC ("Premier"), a direct competitor of Hanline.

4.      Gluzman is a former Sales Associate of Hanline who worked under Dunaway in Hanline's Chicago office.  Upon information and belief, Gluzman is currently employed by Premier.

5.      Szczerba is a former Sales Associate of Hanline who worked under Dunaway in Hanline's Chicago office.  Upon information and belief, Szczerba is currently employed by Premier.

6.      Premier is a limited liability company organized and existing under the laws of Texas.

## **JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Hanline has asserted a claim under the federal Defend Trade Secrets Act.

8.      This Court also has subject matter jurisdiction of this matter pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000.

9.      As described in more detail below, proper venue lies in this Court pursuant to 28 U.S.C. § 1391(b) based on the venue selection clauses contained in Defendants' respective

agreements and because a substantial part of the events giving rise to Hanline's claims arose in Richland County, Ohio.

## GENERAL ALLEGATIONS

10.     Founded in 1986 in Shelby, Ohio, Hanline is a fresh produce supplier to food service, retail, food manufacturing, and wholesale distribution companies throughout the United States.  In addition, Hanline's produce brokerage business involves Hanline acting as a third party to facilitate transactions between large commercial produce growers throughout United States, Mexico, Central America, and South America on the one hand, and wholesalers and retailers throughout the United States on the other.

11.     Premier is a direct competitor of Hanline.  Like Hanline, Premier is a fresh produce supplier that distributes throughout the United States.  Premier also has a produce brokerage business where, upon information and belief, Defendants are currently employed.

## DUNAWAY'S HISTORY WITH HANLINE

12.     Dunaway was previously a co-owner and employee of International Produce Exchange ("IPE"), a food brokerage company.  Upon information and belief, IPE is a licensee of Sunterra Produce Traders ("Sunterra"), a produce wholesaler and distributor.

13.     During his time at IPE, Dunaway worked with Hanline on a regular basis as a broker.

14.     In 2014, Dunaway approached David Wheller, Hanline's Director of Procurement, to discuss joining Hanline and increasing Hanline's presence in the produce brokerage market.  At the time Dunaway joined Hanline, Hanline was generating roughly $2,000,000 in revenue per year in the brokerage market.  This grew substantially during Dunaway's employment with Hanline.

15.     Hanline made the decision to hire Dunaway and commit the necessary resources in order to grow its presence in the brokerage market.  As a result, Dunaway began working for Hanline on or about December 29, 2014.  Hanline also made the decision to build the brokerage team in Chicago, Illinois, near Dunaway's home.

16.     On December 29, 2014, Dunaway executed a Confidentiality Agreement (the "Dunaway Agreement").  A true and accurate copy of the Dunaway Agreement is attached as Exhibit A.  Per the Dunaway Agreement, Dunaway agreed to keep and maintain Hanline's sensitive business information as confidential.

17.     The Dunaway Agreement defines "Confidential Information" as follows:

information about or relating to RS Hanline & Company, Inc. and/or its affiliated and related entities, (collectively, "Company") of a confidential and proprietary nature, including, without limitation: product specifications; customer information and lists; operating methods; all proprietary innovations on vendor's original equipment; product and product development information; past, present and future projects and proposals; customer, prospective customer, vendor and prospective vendor information and relationships; marketing techniques; research processes; purchasing and distributing procedures; financial and economic information, including, for example, prices charged by vendor to Company; accounting and sales information; business plans and other matters concerning Company…

(Dunaway Agreement, Section 1).  For the purposes of the Verified Complaint, "Confidential Information" shall have the same definition as the one contained in the Dunaway Agreement.

18.     In Section 2 of the Dunaway Agreement, Dunaway agreed as follows regarding the steps he would take to protect Hanline's Confidential Information:

(a) Recipient shall maintain in confidence the Confidential Information and shall exercise security measures and a degree of care at least equal to those which the Recipient applies to its own confidential information which, in any event, shall not be less than the security measures and degree of care a reasonably prudent business would apply to its most important confidential information.

(b) The Confidential Information may be disclosed only to those employees of Recipient having the need to know the same and where such employees are informed of the confidential nature of the information and are bound by similar

4

restrictions of confidentiality not to disclose the same. Without limiting the foregoing, Recipient may not disclose Confidential Information to any third party without Company's prior written consent.

(c) The Recipient agrees not to copy, reproduce, or reduce to writing any part of the Confidential Information except as necessary and all such copies, reproductions, or reductions to writing shall be the property of Company.

(Dunaway Agreement, Section 2). The Dunaway Agreement further states that the Confidential Information shall remain the exclusive property of Hanline at all times, and that Dunaway was obligated to return the Confidential Information upon request.

19.     The Dunaway Agreement also contains the following provisions relating to the harm caused by a potential breach:

(a) Because of the uniqueness of the Confidential Information, Recipient acknowledges and agrees that any breach of any of the terms of this Agreement will result in immediate and irreparable injury to Company and therefore Recipient authorizes Company to seek and obtain injunctive relief, without the requirement of posting a bond or other security, in order to prohibit Recipient from (or to cause Recipient to cease) breaching any of the terms hereof, as well as to seek all other legal or equitable remedies to which Company may be entitled.

(b) No remedy conferred by this Agreement is intended to be exclusive of any other remedy and all remedies now or hereafter existing at law or in equity shall be available to Company. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

(Dunaway Agreement, Section 6).

20.     Finally, Section 7(d) of the Dunaway Agreement contains a choice of law provision stating that the Dunaway Agreement is governed by Ohio law, along with a venue selection provision stating that this Court is a proper venue for claims arising out of or relating to the Dunaway Agreement. (Dunaway Agreement, Section 7(d)).

21.     During his employment with Hanline, Dunaway traveled to Ohio on multiple occasions. Additionally, Dunaway was directly supervised by Tommy Rowlands ("Rowlands"),

5

Hanline's Vice President of Sales, who works in Hanline's Shelby office.[1]  Dunaway also frequently worked with individuals in Hanline's accounting department, which is located in Hanline's Shelby office, along with other back office personnel in Ohio.

22.     While Dunaway had industry contacts before joining Hanline, Hanline representatives worked with him extensively in order to develop his skillset in the business.  In particular, Rowlands, and Cody Granneman ("Granneman"), Hanline's Chief Operating Officer, spent significant time working with Dunaway on how to develop business plans, accounting practices, accountability metrics, performance indicators, and how to onboard sales representatives.  Affidavit of Granneman ("Granneman Aff.") is attached hereto as Exhibit B, ¶ 3.

23.     In addition to this expertise, Hanline worked directly with Dunaway to help him increase the profit margins earned from Hanline's brokerage services.  Measured from the start of Dunaway's employment with Hanline to the conclusion, Hanline's average profit margin per deal approximately doubled, an increase that was due primarily to Hanline's expertise.

## GLUZMAN AND SZCZERBA ARE HIRED BY HANLINE

24.     In the first half of 2015, Dunaway and Hanline hired multiple employees as sales representatives to assist Dunaway in brokering deals; all of these early hires were onboarded at the Chicago office.  After those individuals left Hanline within the first several months of their employment, Hanline reevaluated its hiring process for sales representatives in its brokerage line of business.  As a result of that reevaluation, Rowlands determined that the company should onboard new brokerage employees at Hanline's primary location in Shelby, Ohio, rather than continuing the practice of exclusively onboarding such employees in Chicago.

---

[1] Allegations contained in the Verified Complaint are based on Rowlands' personal knowledge unless otherwise referenced.

25.     The first two sales representatives hired pursuant to the revised onboarding process were Gluzman and Szczerba, both of whom were hired and began working for Hanline on August 3, 2015.  Szczerba had already graduated college at the time she was hired, but Gluzman was permitted a flexible work arrangement, at full salary, so that he could finish his college degree.

26.     Gluzman and Szczerba did not have any experience or contacts in the produce brokerage industry prior to joining Hanline.

27.     Based on the revised onboarding process, both Gluzman and Szczerba spent the initial three weeks of their employment working and training at Hanline's Shelby, Ohio location.

28.     In the fall of 2015, Gluzman and Szczerba were asked to sign Employee Confidentiality and Non-Compete Agreements as a condition of their continued employment with Hanline (the "Gluzman Agreement" and "Szczerba Agreement," respectively).  True and accurate copies of the Gluzman Agreement" and Szczerba Agreement are attached as Exhibit C and D, respectively.

29.     Gluzman and Szczerba both initially objected to signing their respective agreements, and requested that Hanline revise or eliminate certain provisions.  Gluzman and Szczerba further stated that they intended to consult with counsel before signing agreements containing post-employment obligations.  In response, Rowlands informed Gluzman and Szczerba that, while he understood their concerns and they were welcome to consult with anyone they desired, signing their respective agreements was a condition of their employment.  Rowlands discussed the terms of Gluzman and Szczerba's employment agreements with Dunaway, and Dunaway therefore had knowledge of the terms of such agreements.

30.     On November 12, 2015, Gluzman signed the Gluzman Agreement.  That same day, Szczerba signed the Szczerba Agreement.  Given that Gluzman and Szczerba served in the same capacity at Hanline, the Gluzman Agreement and Szczerba Agreement are identical in substance.

31.     Pursuant to Section 3 the Gluzman Agreement and Szczerba Agreement, Gluzman and Szczerba agreed as follows:

The Employee shall:

A. Use the Employee=s best efforts to perform his duties, and to exclusively promote the Company and its business actively and diligently; and conduct the Employee=s activities on behalf of the Company at all times so as not to detract from, or reflect adversely upon, the reputation of the Company; and after the termination of this Agreement, not to defame or disparage the Company or the Company=s business, services, officers or employees, nor to engage in any unfair trade practices directed toward the Company.

B. Return to the Company within five (5) business days after the termination of this Agreement, in good condition, all Confidential Information (as defined in Paragraph 6 hereof) and all other property of the Company; and be obligated to the ARestrictive Covenants @ set forth in Paragraphs 4, 5 and 6, below.

(Gluzman Agreement and Szczerba Agreement, Section 3) (sic).

32.     Regarding non-competition, Gluzman and Szczerba agreed that:

During the Employee=s employment with the Company and for a period of two (2) years following the termination of the Employee=s employment with the Company for any reason, the Employee shall not, directly or indirectly, individually or in concert with any other person or entity or through a corporation, partnership or other entity, own, manage, operate, control, be employed by, work on behalf of, invest in, assist (financially or otherwise), provide advisory, consulting or other services for, participate in or be interested in or connected in any manner with the ownership, management, operation, promotion or control of any person, corporation, partnership, proprietorship or their business enterprise which is engaged, directly or indirectly, in a business which competes directly or indirectly with the Company or the Company=s employees, sales representatives or independent contractors with respect to the sale of products by the Company. The Employee further agrees and covenants that if he violates this covenant during the two (2) year period following the termination of the Employee=s employment with the Company, the terms of this covenant shall continue for an additional two(2) year period from the time that such violations cease or an injunction is entered by

8

a court of competent jurisdiction ordering such violations to cease, whichever is earlier.

(Gluzman Agreement and Szczerba Agreement, Section 4) (sic).

33.     In Section 5 of the Gluzman Agreement and Szczerba Agreement, Gluzman and

Szczerba agreed to the following non-solicitation obligations:

The Employee shall not, at any time during the term of the Employee=s employment with the Company, or for a period of two (2) years following the termination of the Employee=s employment with the Company for any reason, directly or indirectly, or in concert with any other person or entity, individually or through a corporation, partnership, or other entity, do any of the following:

> A. Solicit, divert or take away or attempt to solicit, divert or take away business or potential business of the Company.

> B. Call upon, communicate, advise or consult with, write, or respond to or inform any customer, client or account of the Company where such customer, client, or account was a customer, client or account previously connected by, sold to or supervised by the Employee while employed by the Company.

> C. Induce, solicit or attempt to induce or solicit any Employee, sales representative or independent contractor of the Company to leave the Company=s employ or association.

The Employee further agrees and covenants that if the Employee violates this covenant during the two (2) year period following the termination of the Employee=s employment with the Company, the terms of this covenant shall continue for an additional two (2) year period from the earlier of the date on which such violations cease or the date on which an injunction is entered by a court of competent jurisdiction ordering such violations to cease.

(Gluzman Agreement and Szczerba Agreement, Section 5) (sic).

34.     In addition to the non-competition and non-solicitation provisions, Gluzman and

Szczerba agreed to non-disclosure provisions that state as follows:

> A. The Employee shall, at all times, keep all Confidential Information confidential, and shall not use such information except while employed by the Company for the benefit of the Company in the course of the Employee=s duties without regard to whether this Confidential Information would be considered not generally known by the public, material or important by anyone not a party to

this Agreement. The Employee hereby agrees to abide by the Company=s determination that any information is Confidential Information and that the same is of a special and unique nature and value, important and material and that it gravely affects the effective successful conduct of the business of the Company and the Company=s goodwill. The Employee further agrees that all Confidential Information is and shall remain the sole and exclusive property of the Company and that upon termination of the Employee=s employment with the Company, all records, drawing, blueprints, manuals, letters, notes, reports, copies thereof and all other materials constituting Confidential Information, whether prepared by the Employee or others, will be left with the Company, or if not then located on the Company=s premises, returned to the Company=s principal offices within five (5) days of termination of employment.

B. As used herein, AConfidential Information@ means information (whether or not reduced to -writing and whether or not patentable or protectable by copyright or trademark, and including information conceived, originated, discovered or developed by the Employee) determined by the Company to be not generally known by the public, about the Company and its methods, processes and business, present or contemplated, including, without limiting the generality of the foregoing, the names, addresses or specifications of any of its business contacts, confidential records, data, formulae, specifications, proposals, manuals, customer lists, or any other information relating to the Company=s business strategies, research, development, services, products, purchasing, accounting, personnel, engineering, marketing, pricing, merchandising or selling.

(Gluzman Agreement and Szczerba Agreement, Section 6) (sic).

35.     Both Gluzman and Szczerba affirmed in their respective agreements that their restrictions were reasonably tailored to Hanline's legitimate business interests and enforceable as written.  (Gluzman Agreement and Szczerba Agreement, Section 7).

36.     In the event of a breach, Gluzman and Szczerba also agreed as follows regarding Hanline's potential remedies:

The parties agree that a breach of the Restrictive Covenants may cause irreparable damage to the Company, the extent of which may be difficult to ascertain, and the award of damages may not be adequate relief, and consequently, the Employee agrees that, in the event of a breach or a threatened breach of the Restrictive Covenants, the Company may institute an action to compel the specific performance of the Restrictive Covenants, and that such remedy shall be cumulative, not exclusive, and shall be in addition to any other available remedies.

10

(Gluzman Agreement and Szczerba Agreement, Section 8).

37.     Finally, in Section 9(E) of their respective agreements, Gluzman and Szczerba both agreed that Ohio law would apply to such agreements, and that this Court is an appropriate venue for any lawsuit arising out of or relating to the Gluzman Agreement and Szczerba Agreement. (Gluzman Agreement and Szczerba Agreement, Section 9(E)).

38.     While working for Hanline, Gluzman and Szczerba had direct contact and developed relationships with Hanline's suppliers and customers (both wholesalers and retailers). Gluzman and Szczerba also developed knowledge of Hanline's profit margins and business model for brokering deals.

## HANLINE PROTECTS ITS CONFIDENTIAL INFORMATION

39.     As described in their agreements, Defendants had access to Hanline's most sensitive Confidential Information and trade secrets including, but not limited to, business marketing, promotional and advertising plans and programs; identity of and agreements or arrangements with suppliers and customers; sales, cost, profit and other financial data; pricing structure, including profit margins; and programs, controls and procedures. This was particularly the case given that Defendants were the only three individuals employed in Hanline's brokerage business unit and its office in Chicago for significant periods during their employment.

40.     Hanline has taken active measures to protect the secrecy of its trade secret and Confidential Information, including but not limited to: requiring employees, including Dunaway, Gluzman and Szczerba, and vendors, and visitors, to sign confidentiality agreements; restricting user access on Hanline's shared drive; segmenting employee access to certain types of information in Hanline's ERP system, and creating policies prohibiting non-business related use of company

11

issued electronic devices.    Hanline also restricts access to computer devices by user name and password, and requires a VPN in order to have full access to the company's system remotely. Affidavit of Chris Yorkowitz, Director of Information Technology at Hanline ("Yorkowitz Aff."), is attached hereto as Exhibit E, ¶ 3.

41.    As a further example of Hanline's information protection policies, at the start of his employment, Dunaway requested permission to use an external hard drive in order to store data related to his work for Hanline.  (Yorkowitz Aff., ¶ 4).  Hanline denied this request, and informed Dunaway that it was a violation of company policy to store Hanline business data on an external hard drive.  (*Id.*).

42.    Hanline takes such precautions to maintain the secrecy of its trade secrets and Confidential Information because it would suffer extreme and unfair competitive harm if such trade secrets and Confidential Information were to be obtained by, or used on behalf, of a competitor.

## PROGRESS OF BROKERAGE BUSINESS UNIT

43.    In 2015, Dunaway's first full year running Hanline's brokerage business unit, this broker business unit essentially broke even financially.  In 2016, the brokerage business unit generated approximately $250,000 in net income.  As a show of good faith to Dunaway for the brokerage unit's progress, Hanline acquired a larger office space in Chicago for the brokerage business at a cost of approximately $2,600 per month.  Hanline also continued to prioritize the success of the brokerage business unit, including by devoting resources to hiring and developing sales personnel.

44.    During Dunaway's tenure at Hanline, he had difficulty conforming to Hanline's structure and corporate procedures.  For example, Dunaway was frequently in conflict with

Hanline's accounting department over his desire to exceed the credit limit set by Hanline in order to close deals.  In one instance, Rowlands was forced to fly to Chicago to reprimand Dunaway and his sales team after Hanline discovered that Szczerba, with Dunaway's knowledge and approval, had booked a transaction outside of Hanline's software in order to avoid exceeding the customer's credit limit.  When Rowlands informed Dunaway that this was a major concern for Hanline and essentially a theft of company resources, Dunaway responded that he felt his team's conduct was appropriate based on the result.

### FINAL PERIOD OF DUNAWAY'S EMPLOYMENT WITH HANLINE

45.     In early to mid-April 2017, Rowlands and Granneman noticed a major change in Dunaway's demeanor.  (Granneman Aff., ¶ 4).  In particular, Rowlands and Granneman observed that Dunaway become less responsive, and seemed disengaged in the business unit.  (Granneman Aff., ¶ 4).  Dunaway also began providing delayed responses to messages from Granneman, who was a personal friend, during this time period.  (Granneman Aff., ¶ 4).

46.     Further evidence of Dunaway's disengagement with Hanline occurred when he rejected an opportunity to appear for a Board of Directors meeting on April 20, 2017, to discuss the success of the brokerage business unit.  Instead of attending this meeting, Dunaway flew to Texas early for a conference.  Dunaway booked this flight to Texas on March 22, 2017.  Notably, Premier is located in Texas within driving distance of the conference Dunaway attended.

47.     As a result of Dunaway's change in demeanor, Rowlands requested that Dunaway fly to Ohio to meet with Rowlands and Granneman and discuss any concerns he had with Hanline.

48.     On May 2, 2017, Rowlands and Granneman met with Dunaway in Ohio to discuss any concerns he had about the progress of the brokerage business.  (Granneman Aff., ¶ 5).  During this conversation, Dunaway become emotional to the point of tears, and expressed his feeling that

he was not trusted by Hanline (in particular, the accounting department), and that there was not sufficient sense of "team" between the Shelby and Chicago operations.  (Granneman Aff., ¶ 5). Dunaway also mentioned ongoing personal cash flow issues, and that he was upset Hanline continued to work with IPE, his former company with whom he was embroiled in a lawsuit. (Granneman Aff., ¶ 5).

49.     During the May 2 meeting, Rowlands and Granneman reassured Dunaway of the company's commitment to both him and the brokerage business, and told him they would take steps to alleviate his concerns.  (Granneman Aff., ¶ 6).  Rowlands and Granneman further reminded Dunaway that the brokerage business was an area of potential massive growth for Hanline, and that it was considered a key component of Hanline's future.  (Granneman Aff., ¶ 6).  Dunaway hugged both Rowlands and Granneman following the meeting, and they felt confident that they would be able to move forward constructively with him.  (Granneman Aff., ¶ 6).

50.     On May 3, 2017, Rowlands sent Dunaway a detailed email regarding the steps Hanline was willing to take in order to address Dunaway's concerns.  In particular, Hanline agreed to convert Dunaway's $20,000 bonus compensation to salary to assist Dunaway with his personal cash flow problems, and to allow Dunaway to participate in executive staff meetings.  Rowlands also encouraged Dunaway to come to Ohio once a month to visit the Shelby office in order better develop Dunaway and his team's relationship with the main Hanline office.  Hanline further committed to hiring additional staff in the upcoming months.

51.     On May 4, 2017, Dunaway abruptly resigned his employment despite Hanline's offer to address Dunaway's concerns.  Dunaway informed Granneman that he did not have any employment lined up, and that he was going to take some time off of work.  (Granneman Aff., ¶ 7).  This was not true; upon information and belief, by this time Dunaway had accepted an offer

14

of employment with Premier or planned to do so.  Dunaway further stated that he would stay on as long as the company needed him, and he eventually agreed to a May 19, 2017, final date of employment.  (Granneman Aff., ¶ 7).

52.     On May 4, 2017, the same day he resigned his employment, a forensic report from Dunaway's Hanline-issued computer establish that Dunaway accessed an external hard drive from his Hanline computer.  (Yorkowitz Aff., ¶ 5; a true and accurate copy of the forensic report is attached hereto as Exhibit E1).

53.     Given the importance of the brokerage business unit to Hanline, on May 5, 2017, Hanline flew Gluzman and Szczerba to Ohio for a meeting with the executive team.  This meeting included Rowlands, Granneman, Tom Rowlands Sr., the President of Hanline, and Bob Hanline, the Owner of Hanline.  (Granneman Aff., ¶ 8).  The executive team assured Gluzman and Szczerba that the company was fully committed to the brokerage unit, and that, as a show of good faith, Hanline would guarantee Gluzman and Szczerba's compensation for a full year at their prior year's earnings, regardless of commissions.  (Granneman Aff., ¶ 8).  Gluzman and Szczerba accepted Hanline's offer on May 8, 2017, and committed to staying on at the company.  (Granneman Aff., ¶ 8).

54.     On May 8, 2017, Hanline's software vendor Produce Pro Software ("PPS") contacted Hanline to inform them of irregularity with Dunaway's activity.  (Granneman Aff., ¶ 9).  Specifically, PPS informed Hanline that Dunaway had contacted them from an email address from a different company and asked that PPS reconfigure the other company's settings to match Hanline's settings.  (Granneman Aff., ¶ 9).  Along with that email, Dunaway attached screenshots he had taken from Hanline's ERP system that contained Confidential Information regarding Hanline customers, including prices.  (Granneman Aff., ¶ 9).  This information is stored on a server

15

at Hanline's Shelby, Ohio corporate offices.  (Yorkowitz Aff., ¶ 4).  Granneman immediately instructed PPS to terminate Dunaway's access to the ERP software.  (Granneman Aff., ¶ 9). However, because Hanline had substantial deals outstanding for which Dunaway had indispensable knowledge that needed to be closed before he left, Hanline did not take any action against Dunaway at that time.  (Granneman Aff., ¶ 9).

55.     Hanline subsequently learned based on forensic report from Dunaway's Hanline-issued computer that, on May 8, 2017, Dunaway accessed a portable flash drive from his Hanline-issued computer.  (Yorkowitz Aff., ¶ 5; Exhibit E1).

56.     On or about May 9, 2017, Dunaway signed separation paperwork stating that he would stay on at Hanline until May 19, 2017.  A true and accurate copy of Dunaway's separation paperwork is attached as Exhibit F.

57.     On May 9, 2017, and May 10, 2017, Granneman worked out of Hanline's Chicago office so that he could spend time directly with Gluzman and Szczerba.  (Granneman Aff., ¶ 10). During that time, Gluzman and Szczerba continued to arrange transactions with sellers and buyers, on behalf of Hanline, and did not indicate any desire to resign.  (Granneman Aff., ¶ 10).

58.     On May 10, 2017, Dunaway met with Mark Damberger, Hanline's Chief Financial Officer, in Ohio to tie up loose ends on remaining Hanline deals.

59.     On May 10, 2017, Dunaway informed Granneman in a phone call that he was joining Premier.  (Granneman Aff., ¶ 11).

60.     On May 11, 2017, Rowlands traveled to Hanline's Chicago office in order to work directly with Gluzman and Szczerba.  That day, Gluzman and Szczerba met with Rowlands to jointly resign their employment.  Despite the fact that the executive team at Hanline had met with Gluzman and Szczerba to confirm their commitment to the brokerage business unit, Gluzman and

16

Szczerba claimed they were resigning because they did not believe they would be able to do the job without Dunaway.  Gluzman and Szczerba both claimed they did not have employment lined up, and that they were going to take time off of work to evaluate their options.  This was not true; upon information and belief, Gluzman and Szczerba had by this time accepted employment with Premier, or planned to do so.

61.     On May 18, 2017, PPS for the first time sent Hanline the messages and screenshots that Dunaway had sent to PPS on May 8, 2017.  (Granneman Aff., ¶ 12; a true and accurate copy of the emails and screenshots are attached hereto as Exhibit B1).  Upon review of those messages, Hanline discovered that Dunaway had contacted PPS from a Premier email address.

62.     Effective May 19, 2017, Defendants had all concluded their employment with Hanline.  At the time Defendants left Hanline, the brokerage business had revenues of approximately $20,000,000, most or all of which may be lost due to Defendants' wrongful actions.

63.     On June 7, 2017, Hanline reviewed the online directory Blue Book Services, a well-respected directory in the produce distribution market that contains information regarding individuals working at companies in the industry.  Upon reviewing Premier's company contacts, Hanline discovered that Gluzman and Szczerba were listed as sales representatives for Premier.  A true and accurate copy of the June 7, 2017, Blue Book Services report is attached hereto as Exhibit G.

64.     In 2017, before Dunaway resigned, he handled a series of transactions between Premier and Hanline.  Premier still owes Hanline over $10,000 in connection with these transactions.

65.     In mid-June 2017, Hanline learned that Dunaway is operating for Premier out of an office in Elmhurst, Illinois.  (Granneman Aff., ¶ 13).  That address is located at 528 South York Street, Elmhurst, Illinois 60126.  (Granneman Aff., ¶ 13).

## DEFENDANTS' EMPLOYMENT WITH PREMIER

66.     Upon information and belief, Defendants' positions with Premier require or will require them to perform work that is the same or substantially similar to their prior work for Hanline.  As a result, Premier has either obtained and used or will obtain and use Hanline's trade secrets and Confidential Information by virtue of Defendants' employment.

67.     Gluzman and Szczerba developed supplier and customer contacts in the brokerage industry solely as a result of their employment with Hanline, and Hanline therefore has a legitimate business interest in protecting its relationships with such suppliers and customers.  Similarly, solely as of a result of their employment with Hanline, Defendants developed knowledge of Hanline's confidential business practices, including metrics for measuring performance that facilitated profitability, and profit margins that could be used to benefit Premier.

68.     Upon information and belief, Defendants, for the benefit of Premier, are actively violating their respective agreements with Hanline, to the actual substantial detriment of Hanline.

69.     Upon information and belief, Defendants are using the training, Confidential Information, and trade secrets they gained during their employment with Hanline to unfairly help Premier compete.

70.     Upon information and belief, Defendants have or will wrongfully divert, use, and disclose and will continue to wrongfully use and disclose (and certainly threaten to wrongfully use and disclose) Hanline's trade secrets and Confidential Information in order to unfairly benefit themselves and Premier.

71.     Defendants' wrongful activities in violation of their agreements and Ohio law either have caused or will cause Hanline to suffer irreparable harm.  Unless Defendants are enjoined from exploiting Hanline's trade secrets and Confidential Information, Hanline will lose the benefit of its Confidential Information that it has developed over the course of its history. In addition, upon information and belief, unless Defendants are enjoined from violating their agreements, they will use and disclose or will continue to use and disclose their knowledge of Hanline's trade secrets and Confidential Information to Premier.

72.     Damages caused by Defendants' actions, as described herein, are extremely difficult to ascertain in that it is impossible to determine the full impact of Defendants' use and disclosure of Hanline's trade secret and Confidential Information to benefit themselves and Premier.

73.     Due to the irreparable harm related to Defendants' conduct, Hanline had no choice but to file this lawsuit to preserve its rights.

## COUNT I – BREACH OF CONTRACT (AGAINST ALL DEFENDANTS)

74.     Hanline incorporates by reference the allegations contained in the preceding Paragraphs of the Verified Complaint as if fully rewritten.

75.     The Dunaway Agreement is a valid contract which imposes certain restrictions on Dunaway.

76.     Dunaway either has breached or will breach his post-termination obligations by using and disclosing Hanline's Confidential Information for the benefit of a third party.

77.     The Gluzman Agreement is a valid contract which imposes certain restrictions on Gluzman.

78.     Gluzman either has breached or will breached his obligations under the Gluzman Agreement by working for Premier, a direct competitor of Hanline.

79.     Upon information and belief, Gluzman has also breached his obligations in the Gluzman Agreement by soliciting Hanline's suppliers and customers and using and disclosing Hanline's Confidential Information.

80.     The Szczerba Agreement is a valid contract which imposes certain restrictions on Szczerba.

81.     Szczerba either has breached or will breached her obligations under the Szczerba Agreement by working for Premier, a direct competitor of Hanline.

82.     Upon information and belief, Szczerba has also breached her obligations in the Szczerba Agreement by soliciting Hanline's suppliers and customers and using and disclosing Hanline's Confidential Information.

83.     Hanline has suffered damages as a result of Defendants' breach of contract.

84.     Unless restrained, enjoined, and ordered to specifically abide by the post-termination obligations under their respective agreements by order of this Court, Defendants will persist in their breach of contract, thereby causing immediate, irreparable damage to Hanline. Hanline has no adequate remedy at law, as the full value of the revenue and profit presently being lost, or yet to be lost, due to Defendants' breach of contract is and will be difficult, if not impossible, to ascertain. The value of the business and trade secrets and Confidential Information being lost exceeds Seventy-Five Thousand Dollars ($75,000.00).

85.     Pursuant to Section 6 of the Dunaway Agreement and Section 8 of the Gluzman Agreement and Szczerba Agreement, Hanline is entitled to injunctive relief as a result of Defendants' breach.

## COUNT II – BREACH OF DUTY OF GOOD FAITH AND LOYALTY
## (AGAINST DUNAWAY)

83.     Hanline incorporates by reference the allegations contained in the preceding paragraphs as if fully rewritten.

84.     Dunaway owed Hanline a duty of good faith and loyalty during his employment with Hanline.

85.     As demonstrated by his actions with respect to PPS and his attempts to use Hanline Confidential Information to benefit Premier while working for Hanline, Dunaway was working for Premier prior to the conclusion of his employment with Hanline.

86.     During the last month of his employment, Dunaway was actively competing with Hanline on behalf of Premier while employed by Hanline.  This includes, upon information and belief, soliciting Gluzman and Szczerba to leave Hanline's employment and join its competitor, Premier.  This misconduct constitutes a breach of the duty of utmost good faith and loyalty that Dunaway owed Hanline.

87.     Hanline has suffered damages as a result of Dunaway's breach in an amount to be determined at trial, but believed to be in excess of Seventy-Five Thousand Dollars ($75,000.00).

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS
## (AGAINST ALL DEFENDANTS)

88.     Hanline incorporates by reference the allegations contained in the preceding paragraphs as if fully rewritten.

89.     The actions of Defendants set forth above constitute misappropriation of trade secrets, and Hanline is entitled to damages and injunctive relief under Ohio Revised Code § 1333.61, *et seq.*

90.     Defendants possess trade secret information belonging to Hanline including, but not limited to, Hanline's marketing, promotional, and advertising plans and programs; identity of and agreements or arrangements with vendors, suppliers, and customers; valuable proprietary technical information; knowledge of Hanline's sales strategies and prospective customers; and sales, cost, profit, and other financial data.

91.     Hanline takes reasonable steps to maintain confidentiality with respect to its trade secret material, including the information referenced above.

92.     During the last few weeks of his employment, Dunaway accessed several external devices from his Hanline-issued laptop.  Upon information and belief, Dunaway used such devices to misappropriate Hanline's trade secrets.

93.     On May 8, 2017, Dunaway used PPS as a tool to enable him to misappropriate Hanline's trade secret customer information for the benefit of Premier.

94.     Upon information and belief, the nature of Defendants' employment with Premier, a direct competitor of Hanline, makes Defendants' use and disclosure of Hanline's trade secrets and Confidential Information to benefit themselves and Premier inevitable.

95.     Because the nature of Defendants activities with Premier will make use and disclosure of Hanline's trade secrets inevitable, Defendants' employment in violation of the confidentiality clauses in their agreements constitutes imminent, immediate, and irreparable harm to Hanline.

96.     Upon information and belief, Hanline will suffer or has suffered irreparable harm and the loss of business as a result of Defendants' misappropriation of its trade secrets, the total economic harm arising from such wrongful conduct in an amount to be determined at trial, but in

excess of Seventy-Five Thousand Dollars ($75,000).  Hanline is entitled to recover such damages pursuant to Ohio Revised Code §1333.63.

97.    Further, pursuant to Ohio Revised Code §1333.62, Hanline is entitled to an injunction that prohibits Defendants and all others acting in association with them, directly or indirectly, from retaining, using, or disclosing the trade secrets.

98.    Because Defendants acted maliciously and willfully in misappropriating Hanline's trade secrets, Hanline is also entitled to recover its attorneys' fees (pursuant to Ohio Revised Code §1333.64) and punitive damages (pursuant to Ohio Revised Code §1333.63).

99.    Hanline has no adequate remedy at law against Defendants' misconduct, in that the damages for such misconduct are difficult to ascertain completely and with precision.  Unless Defendants are restrained and enjoined from further interference, Hanline will suffer irreparable harm in addition to economic harm.

## COUNT IV – FEDERAL DEFEND TRADE SECRETS ACT
## (AGAINST ALL DEFENDANTS)

100.    Hanline incorporates by reference the allegations contained in the preceding paragraphs as if fully rewritten.

101.    The federal Defend Trade Secrets Act of 2016 ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  *See* 18 U.S.C. § 1832, *et seq.*

102.    "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic or engineering information."

103.    During their employment with Hanline, Defendants had access to confidential and proprietary information that constituted Hanline's trade secrets as defined by the DTSA. As described above, this included, but was not limited to, information regarding Hanline's customers

and prospective customers, its bidding and marketing strategies, its pricing models, and proposals and quotes.

104.    Defendants have shared this information with one another (or at least threaten to do so) or have used this information themselves (or at least threaten to do so), in order to directly compete with Hanline on multiple bidding processes.

105.    This information was related to multiple products or services used in, or intended for use in, interstate commerce.  The total annual revenue generated by these products or services is substantial.

106.    This trade secret information: 1) is not known outside Hanline; 2) is known only by Hanline employees, including Defendants, and others involved in the business; 3) is subject to reasonable measures to guard the secrecy of the information, including Hanline's non-disclosure agreement; 4) is valuable; and 5) is difficult for others to properly acquire or independently duplicate.

107.    Defendants knew that they had a duty, pursuant to their Agreements and Hanline's policies, to maintain the secrecy of Hanline's Confidential Information and trade secrets.

108.    Defendants used and, upon information and belief, continue to use this information to directly compete with Hanline on various projects.

109.    Defendants also used and, upon information and belief, continue to use this information without Hanline's knowledge, consent, or authorization to benefit them in a manner that will cause irreparable harm to Hanline.

110.    Defendants' actions constitute actual and continuing misappropriation in violation of the DTSA.

111.    Hanline has suffered damages and irreparable harm as a result of Defendants' breaches of the DTSA.

112.    Hanline is entitled to recover actual damages.

113.    Hanline's damages under the DTSA cannot be adequately compensated through remedies at law alone, thereby requiring equitable and compensatory relief.  Defendants' actions will continue to cause irreparable harm and damages to Hanline if not restrained.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS (AGAINST DUNAWAY)

114.    Hanline incorporates by reference the allegations contained in the preceding paragraphs as if fully rewritten.

115.    Dunaway, by and through his role as Gluzman and Szczerba's supervisor, had at all relevant times knowledge of the Gluzman Agreement and Szczerba Agreement.  Such knowledge includes, but is not limited to, the fact that both Gluzman and Szczerba have non-competition, non-solicitation, and non-disclosure obligations to Hanline.

116.    Upon information and belief, Dunaway, on behalf of Premier, has caused or seeks to cause Gluzman and Szczerba to breach the terms of their contracts with Hanline by working with Premier, a competitor of Hanline.

117.    The actions of Dunaway have seriously damaged, and continue to damage, Hanline in an amount, which shall be proven at trial, in excess of Seventy-Five Thousand Dollars ($75,000).

## PRAYER FOR RELIEF

WHEREFORE, Hanline respectfully requests judgment against Defendants as follows:

A.    For Counts I, III, IV, and V, a preliminary injunction and permanent injunction that states as follows:

i.    Defendants may not use or disclose any Confidential Information and trade secrets of Hanline.  Defendants must return any and all Confidential Information and trade secrets of Hanline in their possession or control within seven days of the entry of the Court's Order, including all copies and reproductions.  "Confidential Information" shall have the same definition as the one in Defendants' respective agreements.

ii.    Defendants will not use or disclose any of Hanline's Confidential Information and trade secrets that they have in their possession or control that cannot be returned to Hanline, including but not limited to any knowledge that Defendants may have retained regarding Hanline's Confidential Information and trade secrets.

iii.    For a period of two years from the date of the Court's Order, Defendants will not, directly or indirectly (as owner, employee, partner, consultant, agent or otherwise) engage in, or assist anyone else to engage in, competition or attempted competition with Hanline. For purposes of this Order, "competition with Hanline" means selling, soliciting, promoting or brokering any products or services that compete with, replace, or are substantially similar to those sold or brokered by Hanline's brokerage business unit at any time during Defendants' employment with Hanline.

iv.    For a period of two years from the date of the Court's Order, Defendants will not, directly or indirectly, solicit or provide competing services or products, directly or indirectly, to any Clients of Hanline or divert, solicit, or interfere with the business relationships between such Clients and Hanline.  For the purposes of this Order, "Clients" shall consist of any business or individual that each Defendant had any dealings with or had access to Confidential Information about during their employment with Hanline, whether such customers actually generated revenue or were prospects for which Hanline provided either a written or verbal bid, quote, or proposal during each's respective employment with Hanline.

v.    For a period of two years from the date of the Court's Order, Defendants will not, directly or indirectly, induce or attempt to induce any employee, vendor, supplier, agent, independent contractor, or other representative or associate of Hanline to terminate his or her relationship with Hanline.

B.    For any remaining harm that is not susceptible to injunctive relief, award additional compensatory damages in an amount to be determined at trial, but in excess of Seventy-Five Thousand Dollars ($75,000);

C.    Award punitive damages in an amount to be determined at trial;

D.    Award costs and attorneys' fees; and

E.    Award such other legal and equitable relief as this Court deems proper.

Respectfully submitted,

**JACKSON LEWIS P.C.**

*/s/ Gary L. Greenberg*
Gary L. Greenberg (#0023180)
Stephen R. Beiting (#0088343)
Park Center Plaza I, Suite 400
6100 Oak Tree Boulevard
Cleveland, Ohio  44131
Telephone:    (216) 750-0404
Facsimile:    (216) 750-0826
Email:  Gary.Greenberg@jacksonlewis.com
        Stephen.Beiting@jacksonlewis.com

*Attorneys for Plaintiff*

27

## VERIFICATION

STATE OF OHIO          )
                                  )     SS:
COUNTY OF Delaware     )

       Tommy Rowlands, under penalty of perjury, verifies that he is the Vice President of Sales for R. S. Hanline and Co., Inc., and that the facts in this Verified Complaint (except those facts based upon information and belief) are true and accurate to the best of his knowledge.



                                        Tommy Rowlands

       Sworn to before me and subscribed in my presence this _18th_ day of July, 2017.

Melissa A. Clancy
Notary Public

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July 2017, a true and accurate copy of the foregoing

**Verified Complaint** was served upon the following parties via personal service:

Thomas P. Dunaway
840 S. Poplar Avenue
Elmhurst, Illinois 60126

and

Olivia Szczerba
2919 N. Nashville Avenue
Chicago, Illinois 60634

and

Dan Gluzman
1100 Old Barn Rd.
Buffalo Grove, Illinois 60089


*Defendants*


/s/ Gary L. Greenberg
Gary L. Greenberg (#0023180)
Stephen R. Beiting (#0088343)
**JACKSON LEWIS P.C.**

*Attorneys for Plaintiff*


4845-3319-8411, v. 1

29